Good morning. Nice little bankruptcy case to get your blood flowing this morning. The first thing I did after I heard that argument was immediately check and make sure I spelled my name right on my brief, and fortunately I did, so I'll proceed. Always a good move to get your name spelled right. Good morning. My name is John Stale. I represent the appellate trappers. I'd like to reserve ten minutes for rebuttal with the permission of the Court. Whenever you've got time left on the clock. The issue in this case, and I'd like to address the preemption issue under the Animal Damage Control Act, is whether a state may regulate how the federal government implements a federal wildlife management program when the federal statute gives complete discretion to the Secretary of Agriculture to implement that program in any way the Secretary deems appropriate.  Well, the standing we have is that Mr. Brennan is an employee of the Wildlife Services. He is a member of the CTA and the NTA. He's here in court today. There are 38 million people in the state of California. This person has been the person most directly affected by the enactment of this proposition. Okay, he doesn't claim an economic injury? Well, he doesn't claim any direct economic injury in the sense of his salary didn't change as a result of the enactment of Proposition 4. He still continues to get paid his salary by the federal government. I would point out that he traps on his own farm, his own ranch. He trapped before he began. I understand he doesn't like the law, just like there are a lot of people who don't like the speed limits. You know, but he has to show more than he doesn't like the law and that he's complying with it. Doesn't he have to show that there's some kind of particular harm? Well, I think the particular harm is that he's not allowed to use the leghold traps. And in addition, beyond that, he's also suffered harm in that he's suffered increased predation on his own farm. Okay, that's an economic loss, isn't it? Well – Which he's disclaimed. I think what we disclaimed is financial loss. And the disclaimer is that we're not making a claim that his salary as a government employee is somehow being adversely affected or anything of that nature. I mean, we have – Let me ask you a question, though. Is he here on a representative capacity on behalf of the federal government, or is he here in an individual capacity? Well, he is a named plaintiff in the lawsuit. He is here in an individual capacity first. He is also here as a representative of the CTA and NTA. You can decide the CTA and the NTA don't have standing to pursue their associational claims, and you're still going to be able to find standing here with regard to Mr. Brennan as an individual. But in the prior case, that is the case that was decided previously by another panel, the federal government came in, as I recall, on the side of the Audubon Society and stood with the Audubon Society and said, yes, we think this is preempted. But that's not the case here. But I don't think that's in any way a requirement for Mr. Brennan as an individual to have standing to try and challenge the statute. The fact is he has been directly, adversely, and immediately impacted by the enactment of this statute, both in his performance of his duties as a federal government employee and also as a private rancher who is basically employing his own services, wildlife services, to trap on his own farm and stop predation on his sheep and his cattle. And if he doesn't have standing, I don't know anyone who could. But wait, those are two different positions you're taking. One is his own private individual, quote, economic injury, and the other one is the preemption issue as to federal government and federal government officials. Now, I thought in the prior case that Section C had been found to be preempted, at least by the Endangered Species Act, right, because it in fact controlled and restrained federal government action. And the panel in that case said, yes, it is preempted, at least as to the Endangered Species Act, right? Yeah, that is correct. Basically, the prior decision said federal trapping on federal enclaves to protect endangered species is that's in a sense protected or preempts Proposition 4. The state can't come in to those federal enclaves and say you can't use illegal traps to protect those endangered species. That's what the prior case did say. Right, so given that prior holding, insofar as this plaintiff is concerned, if he is acting as a federal government agent on behalf of the federal government, then Subsection C has already been deemed to be preempted, hasn't it? Well, preempted as to trapping on federal enclaves, but we're seeking broader relief than that. We're seeking, for instance, his job is, you know, I'm Joe Rancher. I own 75,000 acres. I've got 1,000 head of cattle on the ranch, and I'm losing sheep and cattle to coyotes, which is a huge problem in this state. And so I call Wildlife Services and say, Bring on Mr. Brennan. He comes out and sets the – well, he would be setting illegal traps, but for this proposition, and tries to make efforts to protect that cattle on that private rancher's property. Now, that is a completely different situation from what was dealt with on the Audubon's claims in the first appeal. All right, so you're saying that if he's acting on behalf of the Secretary of Agriculture outside of a federal park or a forest, et cetera, he's acting for purposes of reducing predation, right? He's acting as an agent of the Secretary of Agriculture, that Proposition 4 should be preempted as to him. Yes. I'm not sure I'd want to use the word agent in the sense of the federal government has not chosen, at this point, not to intervene with regard to our claims, and they did in the first action. So then what standing do you have? I mean, remember you posed to me two – or to the Court two positions. He has standing because of his own economic injury, and then secondly, he has standing because as a federal trapper, he's prevented from doing what he generally does, right? Right. That we believe the effect of Proposition 4 on him in both those capacities, it's our position, creates standing. I mean, I think if you go back and you look at the standing analysis from the first appeal, the Court found standing for people who simply want to go out and look at birds, and there'd be fewer birds to look at if the trappers couldn't use these traps to protect these endangered species. That was an aesthetic injury case, as I recall. Well, that was the claimed injury by those people. But the point is that the injury to Mr. Brennan here for not being able to use these traps, the fact that his job is now more difficult, his job is more time-consuming, he's experiencing increased predation on his own ranch, which, I mean, I don't know if you have to characterize that as an economic loss, as a financial loss. I don't know what label you want to apply to it. But the bottom line is that you bundle up a series of facts that surround him as an individual, and it's our position that clearly he has standing because of the impact of the proposition directly and immediately on him. Well, what's curious is, I mean, he might well have had standing, but you stipulated it away. No, no, no, no, no. That stipulate, first of all, if you go back and read the first appeal, the appeal said that there was a couple of issues that were dealt with in terms of standing in the first appeal. One was, was there a threat of prosecution? And the sponsors of the initiative kept harping on the fact that, you know, there was no threat of prosecution, therefore we had no standing. Well, the fact of the matter is someone was prosecuted. The court mentioned that in its opinion, and that court dispensed with the lack of threat of prosecution standing issue. Are you trying to get to my answer to my question? Okay, I'll move on. I'm sorry. I was trying to be as complete. You're meandering here. You know, you remember the question I asked you? About? Could you repeat it? Maybe I lost it. I apologize. I think you did. How about trying to answer the question? Did I stipulate away the standing? Stipulate away. You said no, no, no. No, I have not. Then it went to sort of a long tail. Okay. Why don't you tell me why your client didn't stipulate away?  He said, oh, you know, if anybody has, if he doesn't have standing, nobody has standing. Well, maybe nobody has standing. Sometimes there are harms for which nobody has standing to claim. But here it's a very peculiar case where your client might want that standing, but you stipulated away. Yeah. So maybe the reason he doesn't have standing, nobody has standing, is because you gave away whatever standing he had. The stipulation did not preclude him from making a claim. Why don't you explain it to me? Well, the stipulation, as I understand it— Well, there's no reason to guess about it. Why don't you read it? Okay, I'm not sure where it is. It's not in the record. It says he's not going to, he didn't suffer economic harm. I mean, if there's something about the language that you want me to consider that is different from that, maybe you could point me to the language. Economic harm is a very broad concept. You know, if your job, if this impacts your job, that's economic harm. Okay. If you can't do your job as quickly or as well, or if you lose business, that's economic harm. If people, if your cattle get injured or killed, that's economic harm, because I gather he doesn't have a, you know, he doesn't claim to have had personal affection for the cattle. Okay. I'm just saying, you know, they got your dog or your cat or, you know, your house or something, you could say you suffered a stress, but these are cattle, these are livestock, and we all know the difference between, you know, you keep livestock for economic purposes, whereas you might keep pets for, you know, personal. The stipulation. But when you're dealing with livestock, you're dealing with economic harm. Yeah, go ahead. Okay, the stipulation, at least I understand it, is that we're not making the allegation that he suffered economic losses associated with his job as a trapper, in the sense that he has no reduced wages. Associated with his job as a trapper? He what? Is it in there? Does it say associated with his job as a trapper? I'd have to get out the stipulation and read it to know the exact language, but that was certainly my intent when I entered into it. Well, would you like to take a look at it? Sure. Do you know what age the? It's a 409. 409? I think it is, yeah. My excerpt is the record or theirs? It's the one that says Meyer and Glitterstein. Okay. 409. 409? Yeah, at the bottom it says 409. It's something that's labeled Exhibit B. It's in this thing that has a lot of his name on it. Could you just give me the exact page number? I'm reading through it now. You look at it? I've got it in front of me. I'm just looking for the exact page number that contains that language. Constantly astonished when counsel come to court not having a key document. May I have the page 411? Bottom. Please. Number 3. Number 3, okay. Okay. Financial injury incurred by any plaintiff, individual, organization or member of plaintiff organization. So, I mean, as I read that, what we're talking about is financial injury. Well, financial injury with reference. Financial injury, well, I hate to add language to the stipulation. I don't intend to do that. Well, then don't. Okay. I'm not going to. Financial injury in this paragraph means finances, money that he has lost. Such as cattle loss. Well, I didn't really think of that as financial injury when I entered into the stipulation. I mean, the fact of the matter is if he has cattle on his own ranch and he's going to eat that cattle, which he does, as well as his own sheep, you know, I would not call that financial loss. I might call it economic loss, which is different. But certainly financial loss to me is a, you know. There's a difference between financial loss and economic loss? I would say yes. Okay. Why don't you explain to me the difference? Well, I think financial loss is basically, at least in this context, it's intended to refer to essentially his paycheck. It's not in any way intended to refer to whether he has standing with regard to losses he's experienced. Financial injury. Financial injury. Yeah. All right. Well, even aside from the issue of whether he's experiencing financial loss, I believe if you go back and read the first opinion, the court found there was standing with regard to economic and financial losses because there were commerce cause claims that were pled in that case. And the financial loss or economic injury was relevant to the standing issue with regard to the commerce cause preemption issue. It did not, the court's opinion, at least as I read it, did not in any way require any kind of financial injury or even economic injury with regard to the issue of standing to pursue the claims under the Animal Damage Control Act. Well, that's fine. So now we put aside financial injury, and you go ahead and tell us what else there is. I mean, since that's what we're beginning at. Okay. So if you put away his job-related financial injuries, if you put away the cattle that he lost, the money he lost because of cattle, what's left? What's left is the fact that his job has become more difficult and his ability to protect his, you know, aside from whether you want to measure the economic value of that or not, his ability to protect livestock on his own farm has been harmed. And ultimately the standing issue here- I'm sorry. I guess I don't understand how those are just another way of restating financial injury. Okay. Well, just then get rid of that and- Why does he care about the cattle except for the fact that he can sell them for meat? I mean, you know, he, that's what livestock is for, you know. Otherwise, you wouldn't feed them. You wouldn't, you wouldn't, you wouldn't, you wouldn't, you know. There's no point in taking care of livestock. I mean, it's unlike pets again. I mean, pets people take care of for psychological, you know. They have a, you know, relationship with the animal that is personal. And, you know, that's very different from animals that we keep for purposes of eating or- Well, I mean, if you want- Well, I believe, I'd have to go back, but I believe even in Mr. Brennan's deposition testimony, I don't believe I cite this in the brief because I didn't anticipate this question, but I believe he testifies even in his deposition testimony that he uses- would use these traps if he could to protect the animals that are- not the animals, but even the pets that are on his farm. And put aside the financial injury, the fact of the matter is, I think the standing issue here comes down to the fact that he can't use the traps. That's what the whole case has been about. It's like somebody saying, I object to the speeding laws because I can't go as fast as I want to go. How, I mean, that's, he's just another guy who doesn't like the law. How is that particularized in concrete? Well, if he gets prosecuted- Right, but he's not claiming threatened prosecution. Okay. That's another one that got stipulated away. Well, no, it didn't stipulate away. Oh, that's not in the case. Let's put it that way. Okay. Well, if he exceeds the speed limit and he's prosecuted, certainly he could then make any constitutional challenge he wants through the constitutionality of the speed law. I mean, obviously he doesn't have a prayer because on the merits he doesn't have a claim. Similarly, I think in this case, if he's altered and changed his behavior as a result of the law, he's no longer allowed to use these traps, I think that's enough to give him standing to make a challenge to the constitutionality of the act. Now, whether there's any merit to that, that's a different issue. Your Honor, I believe you had a question. Yeah, but this is not really about whether he's being prevented from doing his job, i.e. trapping. This is really about whether he's being prevented from doing his job in a particular way, right? Isn't that what it's really all about? Yes, that's right. Okay. And really the ADCA, the Animal Damage Control Act, is designed to let the Secretary of Agriculture decide when they need to put certain controls for predation purposes, right? Right. Right. And the Secretary of Agriculture is not here challenging this statute. It's this gentleman in his own individual capacity challenging the statute, correct? That is correct. And what he's saying is, I want to trap and I want to be able to trap in this way, but the Animal Damage Control Act, I'm sorry, Proposition 4 prevents me from doing that. So, he's saying, I don't really like the way I am being told I have to go about my job. Yes, that's correct. So, what's the constitutional right that's being protected? Well, I believe the constitutional claim is that the state may not regulate how the federal government implements a federal program, and he happens to be one of the actors or one of the employees in that federal scheme. If you look at the language, 7 U.S.C. Section 426 and 426B, which are the statutes that give the Secretary the authority to act or to implement the Animal Damage Control Act, it states the Secretary may take any action the Secretary considers necessary. The Secretary may employ such means as may be necessary to execute the functions imposed upon him. Right. The language couldn't be clearer that the Secretary has the authority to do it any way he deems appropriate. Now, if the Secretary makes a choice that they want to comply with state law and they elect not to use leghold traps, they're free to do that. They're free to do that. But the question is whether they have to do it. And those are different issues. That takes me to another question I wanted to ask you, and that is this. What, if any, is the effect of the fact that the ADCA was amended subsequent to the filing of the third amended complaint in this case? Does it not render the whole issue moot anyway? No, I don't believe so. In fact, I think if you look at the House Conference Report 106-948, page 6, and it's quoted in the brief and it's part of the excerpts of record, the report actually states that the Secretary is expected to take all action necessary and proper, and it continues this, it uses that language very broad, saying the Secretary can basically use whatever methods it deems appropriate to enforce the Animal Damage Control Act. And that part of the House report actually talks about urging the Secretary to consider non-lethal methods of control, but implicitly recognizing that lethal methods would still be used if necessary. So I think, no, I don't believe the 2000 amendment made this issue mooted at all. And I think if you go back and you look at the legislative history, it actually affirms our position, which is that the state doesn't have the right authority to regulate how the federal government enforces the Animal Damage Control Act. My time is up, so I will save it. Thank you. Your Honor, may it please the Court, my name is Clifford Lee. I'm a Deputy Attorney General with the California Attorney General's Office, and I'm representing the State Appellee in this case. Hi, Mr. Lee. Was there anything you heard today that was not adequately addressed in your brief? I would like to respond to a couple of questions that were raised in his presentation then, unless you have some questions. If you think they weren't adequately addressed in your brief, then I think you'd better talk. I think, Judge Kasinsky, he's giving you the hint that you may not have to say anything. I might want to just clarify that Mr. Brennan has expressly conceded that he was not speaking on behalf of the United States, if there's any confusion. You think we didn't know that? On oral argument? You really think we didn't know that? Well, did you hear Judge Tillerman's questions? Judge Benitez's questions? You think we missed that point? I gather you caught it. If it's on 121 in the Executive Records, if you need documentation. Unless you have any further questions then with regard to anything in the brief, I'll stand and submit it then. Thank you. Thank you, Your Honor. I'm afraid we're running out of time, but I reserve it on behalf of the defendant and the defense as well. Thank you. Cajun Sargi will stand for a minute. We are adjourned.
judges: Kozinski, Silverman, Benitez